# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| PRANAV MISHRA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 4:23-cv-01537-SGC |
| ) | |
| STATE FARM FIRE AND ) | |
| CASUALTY COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This matter arises out of the collapse of a retaining wall at the home of plaintiffs Pranav Mishra and Mamta Mishra. (Doc. 1-1). The Mishras have sued defendant State Farm Fire and Casualty Company for breach of contract and bad faith failure to pay their resulting insurance claim. (*Id.*). State Farm has moved to exclude the expert testimony of Scott Skipper because (1) it is not based on reliable methodology, (2) it does not assist the trier of fact, and (2) the Mishras did not comply with the obligations of the Scheduling Order or Federal Rule of Civil Procedure 26(a)(2)(B). (Docs. 12, 16). State Farm's motion is fully briefed and ripe for review. (Docs. 19, 21, 25, 26). After careful review and for the reasons discussed below, the court will grant State Farm's motion to exclude Skipper's causation opinion.

## I. Background

The Mishras reside at 145 River Brow Drive, Gadsden, Alabama 35901 (the "Property").[1] During the night of January 3, 2023, a rainstorm occurred at the Property. (Doc. 17-1 at 9). The following morning, Pranav walked outside and saw the Property's retaining wall, driveway, and fence had collapsed. (*Id.* at 7-8). He also saw that large trees had fallen next to the retaining wall. (*Id.* at 9-10). Pranav reported the loss to State Farm, who hired a licensed forensic engineer, Joshua Bracket, to investigate the cause of the collapse. (*Id.* at 9; Doc. 17-5 at 8-9). Bracket ultimately concluded, in a report dated January 24, 2023 (the "First Report"), that the retaining wall (and subsequently, the driveway) collapsed because of lack of adequate drainage and lack of lateral reinforcement in the retaining wall. (Doc. 17-4 at 21). State Farm then denied the Mishras' claim on January 26, 2023, because it concluded the retaining wall collapsed due to

---

[1] Pursuant to the Court's Civil Administrative Procedures Manual for CM/ECF, a party's address should be redacted so that only the city and state are identified, unless otherwise ordered by the court. Here, however, the Mishras disclosed their address in their initial complaint (Doc. 1-1), and their address appears throughout the docket, including in State Farm's brief in support of its motion for summary judgment (Doc. 18 at 4), the Mishras' response brief (Doc. 23 at 4), and exhibits in opposition to State Farm's motion for summary judgment (Doc. 23-2 at 3). Federal Rule of Civil Procedure 5.2(h) provides that "a person waives the protection of Rule 5.2(a) [which governs redactions of social security numbers, birthdays, minors, and financial account numbers] as to the person's own information by filing it without redaction and not under seal." The court finds the waiver principle applies equally to the requirements of the Civil Administrative Procedures Manual. Further, the property address is an essential component of the litigation. Accordingly, the court finds it unnecessary to redact the property address at this late stage of the proceedings.

hydrostatic pressure and/or a defect in its design and reinforcement and was therefore a loss excluded by the Policy. (Doc. 17-6 at 3).

While State Farm investigated the loss, Pranav hired Scott Skipper with Skipper Engineering to place sandbags and tarps around the collapsed retaining wall and driveway. (Doc. 17-3 at 9). Skipper, who obtained his Bachelor of Science in civil engineering in 1986 from the University of Alabama, is a registered engineer and land surveyor. (Doc. 16-6 at 8). He is a civil engineer, as opposed to a structural engineer, who generally deals with storm drainage, sanitary sewers, potable water, road building, and general site improvement (such as grading plans). (*Id.*). By contrast, structural engineers deal with details and structures surrounding concrete and steel structures. (*Id.*).

Skipper first visited the Property within a few days of the loss. (*Id.*). The purpose of this visit was to determine how to repair the home rather than to give an opinion as to what caused the collapse. (*Id.* at 11). On February 3, 2023, Skipper wrote a letter to Pranav offering several theories as to the retaining wall's collapse. (Doc. 16-3). Skipper agreed there was inadequate drainage behind the retaining wall and the wall was structurally unsound. (*Id.*). He noted that in the 17 years since the retaining wall was constructed, there had been many large rainfall events which did not cause the wall to collapse. (*Id.*). He further stated:

> Another plausible theory of the mechanism that triggered the collapse could be associated with the trees at the toe of the wall. Over time the

3

> small trees could have gotten big enough or the old ones weak enough, that the winds reported that night moved their root systems enough to trigger the event.
>
> The truth is, as stated in the conclusion of the [First Report], they have presented an "opinion." I would seriously doubt that they can say that groundwater was unquestionably the cause of the failure. I would be equally surprised if they could say that movement of the trees' root structure could not have instigated the collapse.
>
> As is often the case with subsurface issues, an answer that is indisputable can be very illusive [sic], if not impossible to determine without some degree of doubt. There could have been numerous factors, or combinations of, that could have been involved in triggering the collapse. We can pursue the answer relentlessly but I do not believe any answer can be provided that one can say is the undisputed absolute fact.

(Doc. 16-3).

The Mishras retained Skipper as an expert witness in this action in May 2024.[2] (Doc. 16-6 at 26). Skipper issued a report on June 21, 2024, which State Farm received just one day before Skipper's deposition. (Docs. 16-4, 16-5). His report noted that the February 2023 letter "was not intended to be a technical analysis. It was intended to convey an alternative theory only." (Doc. 16-5 at 2). Skipper's June 2024 report stated that on the night the wall collapsed, 1.55 inches of rain fell and he was "of the opinion that with the shallow footing of the failed wall and its position on the side of the sloping terrain, groundwater would likely migrate beneath the wall, and we would be doubtful impoundment of water behind

---

[2] The Mishras' deadline to disclose expert witnesses was April 19, 2024. (Doc. 14 at 2).

the wall would be a major issue." (*Id.*). Skipper further noted that the fastest windspeed that night was recorded as 29.1 miles per hour and, based on his familiarity with the general area, winds at the Property likely exceeded those recorded at a local monitoring station. (*Id.* at 3). "If the wind speed was only 2 miles per hour greater than that reported at the monitoring station, we would be in the next classification of 'near gale' which is defined as whole tre[e]s in motion." (*Id.*). Skipper concluded:

> Our contention has been that an alternative theory would be the wind could have caused the trees at the toe of the wall to move enough to trigger the collapse. That the retaining wall, even with the deficiencies noted, has held fast for more than 17 years. Just in the year preceding the failure, the Airport recorded rain events exceeding 1.55" on 7 occasions and exceeding 1" on 17 occasions. Given the previous year's data it becomes clear that over 17 plus years the wall has held fast against a vast number [of] rain events of greater magnitude. We believe that the factor that changed over this time frame would be the growth of the trees along the toe of the wall. We believe it is more likely that the movement of the trees and subsequently the movement of the base of the trees instigated the collapse of the retaining wall.

(*Id.*).

During his deposition, Skipper was asked about the wind level needed to move a tree as he theorized:

> Q. Explain that theory [that the trees triggered the collapse of the retaining wall].
>
> A. That if the wind—these trees have grown up over the years that were growing there at the toe of the wall. If the wind moved them enough, they could—that movement could have triggered that wall to fall.

> Q. What strength of wind would be needed to move a tree to then cause the wall to fail?
>
> A. I don't know that anybody can put an exact number to that.
>
> Q. And you haven't put a number to that?
>
> A. Well, in the [June 2024] letter we mention that if you have got just two mile[s] an hour more wind than what was reported at the airport, that that would have been classified as near gale and it says that it has whole trees in motion. So I would think if you got into whole trees in motion, that would be enough to make the wall fall.
>
> Q. But do you know that with any certainty as we sit here today?
>
> A. That's what I am saying. I don't think that anybody could say with certainty what made that wall fall.

(*Id*. at 18-19). Skipper was also asked about his theory that the wind at the Property exceeded that at the recording station:

> Q. So is there any sort of actual measurement anywhere that measures this theory of the winds coming off of the river surface?
>
> A. I don't think anything you find would dispute that you have got faster winds coming off of water, that you have got friction on the surface and the winds would be faster off of water but –
>
> Q. But is there an action measurement or have you measured it at any point in time?
>
> A. No, just living on the river my whole life there.

(*Id*. at 23-24). Skipper did not offer an opinion regarding "what most likely caused the [] damage" at the Property. Specifically, Skipper testified as follows:

> Q: So as you are sitting here today, you don't think that even you could say what triggered that wall to fall?
>
> A: I could not. Not with any certainty, you know, not to say absolute.

6

(*Id*. at 18). Skipper then testified:

> Q: And so moving on down halfway through the page, it says our contention has been that an alternate – alternative theory would be the wind could have caused the trees at the toe of the wall to move enough to trigger the collapse. So, again, this is just a plausible theory?
>
> A. The more we have looked at it, the more I think that is the more likely of the causes.
>
> Q. And would you say that with a degree of engineering certainty, that that is what happened, or are you just saying it is a theory of what's more likely to have caused it?
>
> A. That if you look at the – just logically look at what has changed and what has happened over the years, that that is the more logical explanation for what happened to it.

(Doc. 16-6 at 24). This is the first time Skipper has been involved in litigation relating to the collapse of a retaining wall. (*Id*. at 10).

## II. Standard of Review

Federal Rule of Evidence 702 governs the admission of expert testimony and requires that, before admitting an expert's opinion testimony, the court be satisfied certain conditions are met:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in which the Supreme Court held that Rule 702 requires a district court to perform a critical "gatekeeping" function for the admissibility of scientific and technical expert testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). In the Eleventh Circuit, a district court applies a three-part test to determine whether a proposed expert's testimony is sufficient under *Daubert*. "Under this test, a court must consider whether: (1) the expert is sufficiently qualified to testify on the issues he intends to address; (2) the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1252 (11th Cir. 2010) (quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The party offering the expert testimony has the "substantial burden" of proving the proposed expert's testimony is admissible by a

preponderance of the evidence. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). With respect to the reliability prong, the proponent of the expert testimony must establish that the expert's testimony is "ground[ed] in the methods and procedures of science," as opposed to the expert's "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589–90 (quotation marks omitted).[3] *Daubert* set forth four criteria to guide courts in determining the reliability of an expert's testimony: (1) Has the expert's methodology been tested or is it capable of being tested? (2) Is the expert's technique subject to peer review? (3) What is the known and potential error rate of the methodology? (4) Is the technique generally accepted in the applicable scientific community? *See id.* at 593–94.

A district court enjoys "considerable leeway" in making evidentiary rulings, including those regarding the admissibility of expert testimony. *Cook ex rel. Est. of Tessier*, 402 F.3d at 1103 (internal quotation marks omitted). Such rulings are reviewed under the deferential abuse-of-discretion standard, and they will not be reversed unless manifestly erroneous. *Id.* Moreover, the standard is not relaxed

---

[3] *See also* Rule 702 (testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and the expert witness must have "reliably applied the principles and methods to the facts of the case").

even though a ruling on the admissibility of expert testimony may be outcome-determinative. *Id.* at 1107.

Ultimately, the court must focus its inquiry on the methodology employed by an expert to reach his or her opinions, rather than on the opinions themselves. *Daubert*, 509 U.S. at 594–95. "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). That is for the jury. *See id.*

### III. Analysis

Unlike a lay witness, an expert may offer an opinion, including one that is not based on firsthand knowledge or observation. *See* Fed. R. Evid. 702 and 703. This relaxation of the usual requirement of firsthand knowledge "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.

As the proponent of Skipper's testimony, the Mishras must establish that his opinion is reliable under *Daubert*, meaning that his testimony is "ground[ed] in the methods and procedures of science," as opposed to his "subjective belief or unsupported speculation." *Id.* at 589–90 (quotation marks omitted). More specifically, they must demonstrate, by a preponderance of the evidence, that (1) Skipper's causation opinion is testable; (2) the known or potential error rate for his opinion; (3) his opinion has been peer-reviewed or he used a peer-reviewed source to reach his opinions; and (4) the general acceptance of his opinions. *See id.* at 593-94.

State Farm challenges the reliability of the methodology underlying Skipper's expert report. It argues (1) Skipper initially visited the Property to determine how to repair it, not to determine the cause of the collapse, and (2) Skipper did not investigate the cause of the failure but instead relied on his familiarity with the Property based on his visits in early 2023 to determine how to

11

repair the retaining wall. (Doc. 16 at 11, 13). In response, the Mishras claim Skipper is properly educated and experienced with civil engineering.[4] (Doc. 19 at 14). They also contend Skipper "has been heavily involved in the property damage at issue in this case and has demonstrated familiarity with the [P]roperty and knowledge of the surrounding area - making his testimony uniquely reliable in this case." (*Id.* at 15). They cite Skipper's multiple trips to the Property, as well as his review of rain and wind records. (*Id.*).

The record before the court does not reflect that Skipper's opinion was reached through a methodology that satisfies the *Daubert* factors. Instead, it appears Skipper's testimony is based primarily on his general experience with the geography surrounding the Mishras' residence. The court cannot discern what, if any, scientific methodology Skipper applied to either his initial letter or June 2024 report. Notably, Skipper testified that his February 3, 2023 letter was not intended to be a technical analysis but instead was meant to convey a "possibly plausible theory." (Doc. 16-Exhibit F at 81:12-17). This is the type of "subjective belief [and] unsupported speculation" prohibited by *Daubert*. 509 U.S. at 590.

The June 21, 2024 report is similarly deficient. Skipper opined that, based on recorded measurements at the local airport, tree roots may have moved because of increased wind speeds on the river. (*Id.* at 88:1-19). Skipper also testified,

---

[4] State Farm did not contest Skipper's qualifications. (*See* Doc. 16 generally; Doc. 21 at 8.).

however, that he does not know the wind strength needed to move a tree in such a manner. (*Id*. at 68:6-9). Further, Skipper admitted he did not measure the wind speeds on the river. (*Id*. at 89:5-8). Rather, he arrived at this conclusion based on "just living on the river my whole life." (*Id*.).

*Daubert* requires this court to ask the following four questions to determine whether Skipper's testimony is reliable: (1) Has Skipper's methodology been tested or is it capable of being tested? (2) Is his technique subject to peer review? (3) What is the known and potential error rate of the methodology? (4) Is the technique generally accepted in the applicable scientific community? *See Daubert*, 509 U.S. at 593–94. Neither Skipper's testimony nor the Mishras' response to State Farm's motion to exclude answer any of those questions. Further, Skipper's admission that he does not know the wind strength needed to uproot trees is problematic because the Eleventh Circuit has held that "[r]elevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion. Opinions derived from erroneous data are appropriately excluded." *United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997) (internal citations omitted).

    The Mishras have not shown by a preponderance of the evidence that Skipper's causation opinion is reliable because it is testable, peer reviewed, or generally accepted. Nor does the record reflect the known error rate for Skipper's

opinion. Therefore, State Farm's motion to exclude Skipper's expert testimony is due to be granted. Because Skipper's testimony is due to be excluded on reliability grounds, the court does not reach State Farm's arguments regarding Skipper's alleged lack of opinions or the Mishras' alleged failure to comply with the Scheduling Order and Rule 26(a)(2)(B).

## IV. Conclusion

For the foregoing reasons, State Farm's motion to exclude the expert testimony of Scott Skipper is **GRANTED**. (Doc. 16). Skipper may not opine as an expert witness on the causation of the collapse of the retaining wall at the Mishras' residence, and the court will not consider his opinions in evaluating State Farm's motion for summary judgment.

**DONE** this 25th day of September, 2025.

_/s/ Staci G. Cornelius_
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE